UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
K.D.,                              )
                                   )
            Plaintiff,             )
                                   )
v.                                 )    CIVIL ACTION
                                   )    NO. 20-11964-DPW
HARVARD PILGRIM HEALTH CARE, INC., )
HARVARD PILGRIM-LAHEY HEALTH       )
SELECT HMO, and LAHEY CLINIC       )
FOUNDATION, INC.,                  )
                                   )
            Defendants.            )
```

<u>MEMORANDUM AND ORDER</u>
December 12, 2022

K.D. challenges the decision of Harvard Pilgrim Health Care, Inc. to deny her claim for certain out-of-network mental health benefits from the Harvard Pilgrim – Lahey Health Select HMO, a Plan under the Employee Retirement Income Security Act ("ERISA") and asserts that this Plan violates the Mental Health Parity and Addiction Equity Act.  The parties filed cross-motions for summary judgment on all Counts.[1]  [Dkt. Nos. 34, 37]

## I. BACKGROUND

### A.   *The Parties*

The **Plaintiff, K.D.,** is a **dependent** beneficiary under the Harvard Pilgrim – Lahey Health Select HMO.  [Dkt. No. 43 at ¶1].

---

[1] In addition, Defendants filed three motions to strike.  [Dkt. Nos. 40, 48, 51]  For her part, K.D. seeks attorneys' fees, a matter which will require further factual development in connection with the remand I will order.  I address the motions to strike in the Appendix attached to this Memorandum and Order.

K.D. brought this action against the **Defendants, Harvard Pilgrim Health Care, Inc. ("HPHC"), Harvard Pilgrim – Lahey Health Select HMO ("the Plan"), and Lahey Clinic Foundation, Inc. (collectively, the "Defendants").** [Complaint, Dkt. No. 1. at ¶1]  HPHC is a not-for-profit corporation based in Wellesley, Massachusetts.  [Dkt. No. 45 at ¶1]  The Plan is an "employee welfare benefit plan" under ERISA.  *See* 29 U.S.C. § 1002(1).  [Dkt. No. 45 at ¶2]  Lahey Clinic Foundation, Inc. is a not-for-profit corporation, based in Burlington, Massachusetts.  [Dkt. No. 45 at ¶3]

**B.   *Factual Background***

   1.   The Plan

The Plan is self-insured, and Lahey Clinic Foundation, Inc. is the Plan Sponsor.  [Dkt. No. 45 at ¶4]  HPHC is the Plan's third-party administrator, providing administrative services. [*Id.* at ¶6]  HPHC serves as the designated claims fiduciary for the Plan and holds "the discretionary authority to make factual determinations and to interpret and apply the terms of the Plan in order to make benefit determinations."  [*Id.*;  *see also* AR4902, 5103]  As the claims fiduciary, HPHC has the authority to "decide claims and appeals in accordance with its reasonable procedures, as required by ERISA. . . ."  [Dkt. No. 45 at ¶6] Optum, a part of United Behavioral Health, contracts with HPHC and handles mental health and substance abuse benefits under the Plan.  [*Id.* at ¶7; Dkt. No. 35 at 8]

The Plan is structured as a health maintenance organization, which offers a limited network of providers. [Dkt. No. 45 at ¶9]  The Plan's benefits are governed by a Benefit Handbook, which states that "Member's [sic] have access to network benefits only from the providers in the Harvard Pilgrim-Lahey Health Select network."  [*Id.* at ¶¶10-12; AR 4970] To receive benefits from an out-of-network provider, a beneficiary must establish that "[n]o Plan Provider has the professional expertise needed to provide the required service." [Dkt. No. 45 at ¶¶10-12; AR 4912-13]  For this provision to apply, "services by a Non-Plan Provider [typically] must be authorized in advance by [the Plan]."  [Dkt. No. 45 at ¶16]  The parties dispute whether any in-network provider had the professional expertise for the particularized mental health treatment that K.D. needed when she secured out-of-network services.  [*See* Dkt. Nos. 35, 38]  To find an in-network provider for mental health services, the HMO Handbook directs members to reach out to the "Behavioral Health Access Center." [*Id.* at ¶20]  The Behavioral Health Access Center is run by licensed mental health clinicians.  [*Id.*]

2.  K.D.'s Medical Diagnoses and Treatment History

In 2018, K.D. was experiencing depression and anxiety, and had a history of eating disorders.  [AR201]  She had experienced various mental health disorders, endometriosis, migraines, and pain previously.  [Dkt. No. 43 at ¶13; AR555-556; AR558]  In

addition, K.D. had previously considered and engaged in self-harm.  [AR3379-81]  K.D. was hospitalized, in 2015, due to reports of suicidal ideation and struggles with "worsening depression."  [AR3379-3381]  Beginning in 2016, K.D. received treatment from Dr. Lalita Haines at Boston Children's Hospital; under Dr. Haines's care, K.D. was diagnosed in 2017 with endometriosis.  [AR561]  In 2016, K.D. left school due to challenges posed by her classmates and medical conditions.[2] [AR1967; 558]

K.D. reported worsening depression in April 2018.  [AR1971] In October 2018, K.D. said that she was falling behind in her coursework and was not attending many classes.  [AR2035]  In mid-October 2018, K.D.'s doctors began discussing programs for her treatment.  [AR 2038; 555-558]  Her provider, Dr. Laurie Gray, suggested Sierra Tucson, LLC ("Sierra Tucson"), an out-of-network facility, because it had "the expertise to treat co-occurring somatic, mood, and eating disorder symptoms, while addressing personality traits that could interfere with treatment."  [AR558]

> a.   *Evaluation and Treatment at Sierra Tucson*

K.D. arrived at Sierra Tucson on November 1, 2018.  [Dkt. No. 45 at ¶47]  One day later, K.D. received a physical

---

[2] The parties dispute the reasons that K.D. left school her sophomore year.  [Dkt. No. 43 at ¶17]  However, based on the record before me, her departure was based, at least in part, on health challenges.  [AR1967; 558]

evaluation by and reported her medical history to Dr. Richard Watts.  [Dkt. No. 43 at ¶30; AR2072-2075]  K.D. reported that she was "not functioning well" and her "depression became problematic at the end of the spring."  [AR2072]  In summary, Dr. Watts explained that K.D. "presents for mood dysregulation," with a "past history of depressive disorder[,] anxiety[,] anorexia [, and] ADHD."  [AR2074]  He noted that K.D.'s "[s]ymptoms have become problematic with mood to the point patient not functioning[,] poor activities of daily living and poor hygiene."  [*Id.*]  His provisional diagnoses included major depressive disorder, general anxiety, "[m]uscle skeletal pain," and anorexia, among others.  [AR2075]

On November 2, 2018, Dr. Everett Rogers conducted a psychiatric evaluation of K.D.  [AR2076-2080]  In his "Assessment and Plan" he noted that K.D. "flew in from Massachusetts for the treatment of mood [and] is a provisional admission due to eating disorders."  [AR2079]  He described her medical history as "complicated" and explained that because of increase in her depression, her eating disorder "is acting more up" and she will "definitely" require a nutrition consult. [*Id.*]

On November 3, 2018, K.D. received a nutritional assessment by Morgan N. Witte, a registered dietician.  [AR2081-2082]  Ms. Witte "[r]ecommend[ed] [the] secondary [eating disorder]

program," among other suggestions related to K.D.'s disordered eating.  [*Id.*]

Finally, on November 15, 2018, K.D. received a psychometric test evaluation at Sierra Tucson.  [AR2166-2167]  Samuel Ballou, PsyD, and Andrew J. Stropko, PhD recommended that K.D. "continue residential treatment and receive psychiatric management for anxiety and depression," as well as "consult[] with a nutritionist to support her in establishing a more regular eating pattern and for nutritional education."  [AR2166]  Additionally, Drs. Ballou and Stropko recommended, among other suggestions, that K.D. would "benefit from participating in integrative services such as EMDR, somatic experiencing, acupuncture, and craniosacral massage."  [*Id.*]

In general, during her time at Sierra Tucson, K.D. participated in group and individual sessions to address her mood disorders, and, via the "secondary eating recovery program," she received individualized and group treatment for her anorexia.  [AR646-647; Dkt. No. 43 at ¶¶35-37]  On December 8, 2018, Sierra Tucson discharged K.D., with the understanding that she would continue care at the partial hospitalization program of the in-network Cambridge Eating Disorder Center in Cambridge, Massachusetts.[3]  [AR647]

---

[3] In K.D.'s reply in support of her motion for summary judgment, she lists Cambridge Eating Disorder Center as one of the in-network options identified by the Behavioral Health Access Center.  [Dkt. No. 47 at 9]  Accordingly, the parties apparently

b.   *Post– Sierra Tucson Treatment*

K.D. began treatment at the Cambridge Eating Disorder Center on December 11, 2018.  [Dkt. No. 43 at ¶41]  She was discharged on January 18, 2019 to an outpatient therapy program. [AR4429]  She remained in an outpatient therapy program through February 6, 2019.  [Dkt. No. 43 at ¶42]

3.   The Events Leading to K.D.'s Claim

K.D's father contacted the Behavioral Health Access Center on October 23, 2018 to discuss residential treatment providers for his daughter.  [Dkt. No. 45 at ¶23]  He explained that K.D.'s therapist had recommended a residential treatment program for her "depression, anxiety and history with anorexia."  [*Id.*; AR201]  The Behavioral Health Access Center gave K.D.'s father a list of in-network providers.  [AR197-201]

After reviewing the in-network providers, on October 25, 2018, K.D.'s father called the Behavioral Health Access Center again, stating that none of the facilities appeared to be appropriate for his daughter because "[K.D.'s] primary issue is depression and anxiety" and the "majority of [the treatment centers] were for substance abuse or they did not have a residential program."  [Dkt. No. 43 at ¶44; AR202]  K.D.'s father also reported that K.D. has a "history of eating

agree that Cambridge Eating Disorder Center is in-network, and her treatment at the facility was "[a]uthorized."  [AR 4414-4416]

disorder." [AR202]  K.D.'s father told the Behavioral Health
Access Center that K.D.'s therapist had suggested Sierra Tucson,
located in Arizona and out of network. [Dkt. No. 45 at ¶24]
In response, the representative at the Behavioral Health Access
Center stated that "that there are no out of network benefits
and the facility could inquire about an exception; however,
[K.D.] has no out of area coverage on her plan so she can only
see providers within the New England area. . . ." [AR202]

On October 30, 2018, Kristina Maldonado, a Professional
Counselor from the Behavioral Health Access Center, called
K.D.'s family, and K.D.'s mother stated that "they intend[ed] to
go [out of network] for treatment." [AR203]  During that
conversation, Ms. Maldonado described the process for receiving
approval to obtain out-of-network coverage, explained that
Sierra Tucson should call within twenty-four hours of its in-
person evaluation of K.D. to justify care at the facility as
medically necessary, and suggested that K.D.'s therapist, Molly
Mayerson, a Licensed Independent Clinical Social Worker, should
call the Behavioral Health Access Center to explain why Sierra
Tucson is the appropriate venue for K.D.'s treatment. [Dkt. No.
45 at ¶¶28-29]  Ms. Maldonado also asked K.D.'s mother whether
she had considered Walden Behavioral Care, LLC ("Walden"), an
in-network provider, and K.D.'s mother explained that K.D.'s
therapist had worked at Walden "and specifically advised [it] is

not recommended" because it "would[]not be able to handle the additional [diagnoses] outside of [eating disorder]." [AR203]

Ms. Mayerson called the Behavioral Health Access Center on October 31, 2018 to provide the requested information. [*Id.* at ¶29] She explained that K.D. had recently had an "increase in depressive, somatic and [eating disorder] [symptoms]." [AR209] Ms. Mayerson reported that K.D. was "unable to get out of bed, missing appointments, not getting to class, [and] neglecting [activities of daily living]" and that she had "daily episodes of restricting follow[ed] by binge episodes." [*Id.*] She explained that although K.D. had a history of suicide attempts and self-harm, she currently was not aware of any suicidal episodes. [*Id.*]

After speaking with Ms. Mayerson, the Behavioral Health Access Center sent the case to peer review on October 31, 2018. [Dkt. No. 45 at ¶30] That same day, the Behavioral Health Access Center reached out to Walden. [AR217] The Director of Admissions at Walden confirmed that it "could complete an assessment for what [level of care] is needed immediately" and "[a] residential bed would be available at the end of this week." [*Id.*]

### 4.   The Review of K.D's Claim

#### a.   *Dr. Allchin's Peer-to-Peer Review*

Ms. Mayerson's discussion with the Behavioral Health Access Center was treated as a claim for Plan benefits. [Dkt. No. 45

at ¶33].   Thereafter, Dr. Theodore Allchin, the Associate

Medical Director for United Behavioral Health[4], reviewed K.D.'s

available clinical information and engaged in a peer-to-peer

review with Ms. Mayerson.  [*Id.* at ¶34; AR221-222] Dr. Allchin's

notes indicate that Ms. Mayerson told him that K.D. required

"treatment in the mental health residential setting" and that

Ms. Mayerson "believe[d] [Sierra Tucson] would be best able to

treat all of her mental health issues." [AR221]  Dr. Allchin

also noted that Ms. Mayerson was "aware" that in-network

residential treatments were identified.  [*Id.*]  On November 1,

2018, United Behavioral Health denied K.D.'s claim and sent

letters to K.D., Ms. Mayerson, and Sierra Tucson.  [Dkt. No. 45

at ¶36; AR4313-4316]  The letter explained that K.D.'s out-of-

network claim was denied, but that Optum authorized Residential

Mental Health treatment with an in-network facility, namely

Walden.  [AR4314]  It also explained K.D.'s rights to appeal.

[*Id.*]

        b.   *Appeal from Denial*

     After the denial, K.D.'s mother requested an expedited

appeal, and HPHC sent K.D.'s file for independent medical review

at Dane Street, an Independent Peer Review Organization.  [Dkt.

No. 45 at ¶39-40; AR223]  On November 5, 2018, Dr. Justin

---

[4] United Behavioral Health, via Optum, conducts reviews of mental
health claims.  The parties' filings seem to refer to the two
entities interchangeably.

Liegmann called Ms. Mayerson for a peer-to-peer discussion, and reviewed other documents, such as the Plan, Optum guidelines, the initial denial letter, and Dr. Allchin's review.  [Dkt. No. 45 at ¶41]  Dr. Liegmann, like Dr. Allchin, determined that K.D. could be treated at an in-network provider.  [*Id.* at ¶42]  On November 6, 2018, HPHC denied K.D.'s claim again, stating that K.D. could be treated at Walden.  [AR4075-4076]

  *c. K.D.'s Second Appeal*

  On December 18, 2018, legal counsel, now engaged to press K.D.'s claim, requested copies of the claim file and all documentation concerning K.D.'s expedited appeal, which HPHC provided on January 25, 2019.  [Dkt. No. 45 at ¶¶66-67]  After some back and forth regarding documentation, on April 8, 2019, K.D. requested a new appeal because K.D. had turned 18 prior to the date of her mother's request for appeal.[5]  [*Id.* at ¶70]  On April 15, 2019, HPHC agreed to void the initial appeal, and gave K.D. sixty days (until June 3, 2019) to file a new appeal.  [*Id.* at ¶71]

  K.D. submitted her new appeal on June 3, 2019 with more than 1,300 pages of medical records, arguing that Sierra Tucson was appropriate, as no in-network providers could offer her the

---

[5] K.D. contended that before she turned 18, she needed to designate her mother, or someone else, to act on her behalf during the appeal process.  [AR 3401]  Because she did not previously ask her mother to appeal her claim, K.D. argued that the initial appeal was invalid.  [*Id.*]

treatment she alleged was medically necessary.  [Dkt. No. 43 at
¶81; AR548-553]  On June 5, 2019, HPHC acknowledged K.D.'s
second appeal and sent her a letter listing her rights and
explaining that the second appeal would be conducted by new
doctors not engaged in her prior appeal.  [AR538-539]

      *d.   Dr. Sharma's First Report*

    HPHC submitted K.D.'s files to Dr. Taral R. Sharma, a
doctor from IRO MES Peer Review Services on June 17, 2019.
[Dkt. No. 45 at ¶77]  Dr. Sharma is board certified in
psychiatry, and holds a sub specialty certificate in addiction
medicine.  [AR4214]  On June 21, 2019, Dr. Sharma completed his
initial report, concluding that out-of-network treatment at
Sierra Tucson was not medically necessary. [6]  [Dkt. Nos. 43 at
¶94; 45 at ¶79]  After the first report, on July 1, 2019, a
doctor at Optum assigned to quality control review identified
some internal inconsistencies[7] in Dr. Sharma's report and

---

[6] The record apparently contains only corrected copies of Dr.
Sharma's June 21, 2019 report.  During the December 7, 2022
hearing on the cross-motions for summary judgment now before me,
K.D.'s counsel identified AR534 as a copy of Dr. Sharma's June
17, 2019 initial report.  However, on the final page of that
record citation, AR536, it states that it is a corrected copy,
dated July 2, 2019.  K.D.'s statement of facts supporting her
motion for summary judgment and the e-mail discussion within
Optum [Dkt. No. 43 at ¶94 (Defs.' Resp. to K.D.'s Statement of
Facts); AR4138-4141] establishes that Dr. Sharma's first and
corrected reports came to the same conclusion, that is, K.D. did
not require treatment at Sierra Tucson.
[7] The Optum reviewer noted that Dr. Sharma's initial report
"contain[ed] some internal inconsistencies," specifically with
respect to K.D.'s history of inpatient admissions.  [AR4138]
K.D. also notes, in her briefings, that Dr. Sharma's reports

requested that Dr. Sharma complete a second review.  [AR4138-4139; Dkt. No. 45 at ¶¶79-80]

After re-reviewing K.D.'s files, Dr. Sharma provided a revised review on July 2, 2019.  [AR4138; 4213-4215] Dr. Sharma stated that K.D. could have been treated at Walden, explaining that she had "reported a history of restricting and purging" and "denied any current suicidal and homicidal ideations" upon admission to Sierra Tucson.  [AR534; 4213]  He concluded that "[t]he [Sierra Tucson] chart notes do not substantiate any extenuating circumstances that support why [K.D.] had to seek an out-of-network provider."  [AR534-535; 4213-4214]  Optum concluded that Dr. Sharma's review was credible and upheld the denial of benefits.  [AR4141]  K.D.'s counsel requested a peer-to-peer call between Dr. Sharma and K.D.'s doctor, Dr. Gray, on July 16, 2019.  [Dkt. No. 43 at ¶95]  K.D.'s counsel also requested confirmation that Dr. Sharma reviewed all documents K.D. submitted in support of her appeal.  [*Id.*]

        e.   *Dr. Sharma's Second Review and Peer-to-Peer Call
             with Dr. Gray*

On July 24, 2019, Dr. Sharma and Dr. Gray held a peer-to-peer call.  [Dkt. No. 43 at ¶97]  Dr. Sharma's notes stated that Dr. Gray identified K.D.'s diagnoses as "major depressive disorder, somatic symptom disorder, attention deficit

---

referred to "radiation," which K.D. apparently never received. [Dkt. No. 38 at 11]

hyperactivity disorder, and unspecified eating disorder."
[AR5278]  Dr. Sharma noted that Dr. Gray explained the "primary"
reason K.D. was sent to Sierra Tucson was for her mood disorder.
[*Id.*]  Dr. Gray opined that although Walden "do[es] a fine job,"
K.D. "needed more of pain management."  Moreover, Dr. Gray
stated that "[K.D.] has some personality component and she
thought that [K.D.] could be better served at Sierra Tucson
compared to Walden."  [*Id.*]  Dr. Sharma eventually concluded
that K.D.'s treatment at Sierra Tucson was not medically
necessary because she could have been treated at the "Eating
Disorder specialty Residential Program" at Walden.  [AR5279]

### f.   Dr. Lowenthal's September Review

K.D. submitted a report from independent reviewer Dr. Sarah
Lowenthal and a sworn statement from K.D.'s parents on September
12, 2019, in response to Dr. Sharma's July 24, 2019 report.
[Dkt. No. 43 at ¶100]  Dr. Lowenthal is "a board-certified
family physician and certified eating disorder specialist."
[AR4577]  Dr. Lowenthal stated that Walden was inappropriate for
K.D. because it primarily treated eating disorders, and K.D.'s
primary challenges were "major depression, anxiety, and complex
pain."  [AR4583]  Moreover, Dr. Lowenthal opined that K.D. "did
not meet the criteria for residential eating disorder treatment
at the time of admission."  [*Id.*]

### g.   September 2019 Denial of Benefits

The HPHC Assistant General Counsel, on September 13, 2019,

wrote to Optum requesting its review of K.D.'s documentation,
noting that "[t]he question in this case is whether Walden
eating disorder center was the appropriate residential in-
network facility to treat [K.D.]."  [AR5252]  On September 13,
2019, Optum found that Dr. Sharma's report was "credible."
[Dkt. No. 45 at ¶94]  Thereafter, HPHC upheld the benefits
denial on September 16, 2019 in its "final decision."[8]  [Dkt. No.
43 at ¶104; AR81-84]  HPHC explained that K.D. "could have
safely and effectively [been] treated at Walden."  [AR82-83]
The letter further explained that "Walden's program can treat
individuals with co-occurring disorders" and that Walden had an
"integrated treatment approach."  [AR82]  After this denial,
K.D.'s counsel requested the claim file, and a written
explanation regarding certain comments made by HPHC during a
September 24, 2019 conversation.[9]

> h.   *HPHC Voluntary Member Reconsideration Program and
>      Dr. Sharma's Third Report*

K.D. requested Voluntary Member Reconsideration, and HPHC
scheduled a meeting regarding K.D.'s claim on March 13, 2020.
[Dkt. No. 45 at ¶102]  On February 7, 2020, K.D. requested that

---

[8] The letter indicates that K.D. may have additional rights of
appeal.  [AR83]  However, Defendants do not argue that K.D.
failed to exhaust administrative remedies.
[9] K.D. puts emphasis on statements allegedly made by HPHC that
there was "not a thorough review" of certain documents in K.D.'s
file.  [AR287]  K.D.'s counsel also disputed whether all
documentation from the file was provided.  [Dkt. No. 43 at ¶115-
116]

Dr. Lowenthal's report and K.D.'s parents' letter be considered in the review.  [*Id.* at ¶103]  After reviewing the documentation, Dr. Sharma released a third review report, and once again determined that K.D.'s treatment at Sierra Tucson was not medically necessary, as K.D. could have been treated in-network.  [*Id.* at ¶105]  In this final report, Dr. Sharma stated that "[t]here are in-network providers that could have effectively and safely" treated K.D.  [AR78]  Additionally, for the first time since the initiation of K.D.'s claim, Dr. Sharma suggested that her treatment could occur at a "less restrictive setting."  [*Id.*]  Optum determined that Dr. Sharma's third report was credible.  Optum also noted that "[Dr. Sharma's] review and the expert hired by the lawyer are speaking to medical necessity, where the problem is not medical necessity but benefit."  [AR42; Dkt. No. 45 at ¶108]

After receiving Dr. Sharma's third report, K.D. withdrew her request for Voluntary Member Reconsideration.  [Dkt. No. 45 at ¶110]  K.D. filed this action thereafter.

## II. COUNT I — K.D.'S ENFORCEMENT OF TERMS OF PLAN AND ACTION FOR UNPAID BENEFITS

K.D. argues that Defendants' review failed in two respects — procedurally and substantively.  Procedurally, K.D. argues that Defendants did not fairly consider her doctors' opinions and the review failed both ERISA's and the Plan's various other procedural requirements.  Substantively, she contends that there

16

was no substantial evidence supporting the Plan's denial of
benefits.  These arguments are, in some respects, cyclical and
overlapping; K.D. argues that the Plan administrator erred
procedurally by ignoring her doctor's opinions, and
substantively, because it did not properly consider these
opinions, the decision lacked substantial evidence.
Accordingly, I will address the weight given to K.D.'s provider
opinions and related issues first, before turning to K.D.'s
other arguments.  Defendants for their part dispute these
contentions, submit that the denials were supported by
substantial evidence, and have cross-moved for summary judgment
on Count I.

## A.    Standard of Review

In the ERISA context, summary judgment "differs
significantly from summary judgment in an ordinary civil case."
*Petrone* v. *Long Term Disability Income Plan for Choices Eligible
Emps. of Johnson & Johnson & Affiliated Cos.*, 935 F. Supp. 2d
278, 287 (D. Mass. 2013).  "[I] sit[] more as an appellate
tribunal than as a trial court" and "evaluate[] the
reasonableness of an administrative determination in light of
the record compiled before the plan fiduciary."  *Leahy* v.
*Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002); *see also*
*McDonough* v. *Aetna Life Ins. Co.*, 783 F.3d 374, 379 (1st Cir.
2015) (explaining that "both trial and appellate courts are
tasked to inspect the claims administrator's actions through the

same lens" in ERISA matters).  Where the ERISA plan gives "the plan administrator discretionary authority in the determination of eligibility for benefits, the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion." *Wright* v. *R.R. Donnelley & Sons Co. Grp. Benefits Plan*, 402 F.3d 67, 74  (1st Cir. 2005) (citations and internal quotations omitted).[10]

Under this standard, "[I] must defer [to the plan administrator] where the decision is reasonable and supported by substantial evidence on the record as a whole." *Arruda* v. *Zurich Am. Ins. Co.*, 951 F.3d 12, 21 (1st Cir. 2020) (internal quotations and citations omitted).  Accordingly, "the mere existence of contradictory evidence does not render a plan fiduciary's determination arbitrary and capricious." *Leahy*, 315 F.3d at 19.  Although this standard is "deferential," "it is not without some bite." *McDonough*, 783 F.3d at 379 (citing *Colby* v. *Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 62 (1st Cir. 2013) ("[W]e hasten to add that there is a sharp distinction between deferential review and no review at all.")).

---

[10] Here, the parties have stipulated that the claims administrator under the Plan had discretionary authority to interpret the Plan's terms and make benefit decisions.  [Dkt. No. 17 at ¶8; Dkt. No. 35 at 4; Dkt. No. 45 at ¶6]  Thus, "[I] ask whether [the plan administrator's decision] decision is arbitrary and capricious or an abuse of discretion." *Arruda* v. *Zurich Am. Ins. Co.*, 951 F.3d 12, 21 (1st Cir. 2020).

<u>1.</u>   <u>ERISA's Procedural Requirements</u>

Pursuant to 29 U.S.C. § 1133, all employee benefit plans must

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

The goal of the notice provisions is to "notify the claimant of what he or she will need to do to effectively make out a benefits claim and to take an administrative appeal from a denial." *Bard* v. *Boston Shipping Ass'n*, 471 F.3d 229, 239 (1st Cir. 2006).

Under the Secretary of Labor's regulations interpreting the statute, "the denial of benefits [must] spell out the specific reasons for an adverse determination, delineate the particular plan provisions on which the determination rests, furnish a description of any additional material necessary to perfect the claim, and provide a description of the plan's review procedures and applicable time limits." *Stephanie C.* v. *Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 813 F.3d 420, 425 (1st Cir. 2016) (citing 29 C.F.R. § 2560.503-1(g)(1)). The "full and fair review" portion of the statute requires "a process that permits a claimant to supply supplementary 'written comments, documents, records, and other [related] information' to the claims

19

administrator." *Id.* (alteration in original) (quoting 29 C.F.R.
§ 2560.503-1(h)(2)).   The claims administrator must provide the
claimant with all records related to the claim, when requested,
and "has a ***duty*** to consider" the claimant's materials, when
submitted.   *Id.* (emphasis added)   Even where the claimant "shows
that procedural irregularities have occurred," she is "typically
require[d] . . . to show prejudice as well."   *Id.*

> 2.   <u>What K.D. Must Prove</u>

First, I address Defendants' assertion (made in opposition
to K.D.'s motion for summary judgment, though apparently not in
their own motion for summary judgment) that K.D. must show that
all in-network mental health providers offered by Defendants
were unable to treat her diagnoses, as opposed to solely
demonstrating that Walden was inappropriate for her treatment.
[Dkt. No. 42 at 7-8]   During the December 7, 2022 hearing on the
cross-motions for summary judgment now before me, Defendants
acknowledged that this argument was inappropriate based on the
record created by HPHC, various medical reviewers, and the
parties in this matter.   However, to frame the issues that I
confront when addressing the merits of the cross-motions for
summary judgment now before me, I turn to Defendants' abandoned
contention at the onset.

Defendants contended that K.D. inappropriately focused on
Walden, and "does not mention any other facility or provide any
information, evidence, or discussion regarding why all of the

other facilities" were inappropriate. [*Id.* at 8]. Defendants are correct that the Plan language requires that "No Plan Provider" can offer the services needed by the member. [AR4912-4913] Yet Defendants focused *their* own argument on Walden, and as extensively described *supra*, the majority of denial letters focused on Walden.

"[T]he First Circuit has held that plan administrators may not introduce in litigation new reasons for denying benefits that were not raised in the internal claims process." *Hatfield* v. *Blue Cross & Blue Shield of Mass., Inc.*, 162 F. Supp. 3d 24, 37 (D. Mass. 2016). In their abandoned contention, Defendants attempted to expand the playing field by the move of demanding an analysis of all providers, in contrast to their own reviews, denials, and arguments that focused on Walden. Without meaning to trivialize the point by use of an extended gamesmanship metaphor, I must emphasize again that this attempted gamesmanship amounted to unsportsmanlike conduct. *See id.* (explaining that "the principle that 'sandbagging' claimants with new rationales is impermissible, given that the 'need for clear notice pervades the ERISA regulatory structure,' is well-established" (citation omitted)). In fact, a fair reading of the denial letters and opinions from Defendants effectively rule *out* the other providers because they focus solely on Walden as *the* appropriate option for K.D. Thus, even apart from the belated abandonment, I would consider solely whether there was

substantial evidence to show that Walden, an in-network

provider, could have properly treated K.D.

**B.    *Whether HPHC, United Behavioral Health, and the Reviewers Properly Considered K.D.'s Doctors' Opinions***

Each of HPHC's three denial letters refer to reviewers who

recommended denying K.D.'s benefits claim based on their review

of the record as it stood at the time.[11]  [*See* AR3831, AR4313,

AR81]  In some cases, Optum reviewed the findings of the medical

reviewers, and determined that they were a credible basis for

benefits denial.

"A plan administrator's decision 'must be reasoned and

supported by substantial evidence' – '[i]n short, [it] must be

reasonable.'"  *Santana-Díaz* v. *Metro. Life Ins. Co.*, 919 F.3d

691, 695 (1st Cir. 2019) (alteration in original) (quoting

*Ortega-Candelaria* v. *Johnson & Johnson*, 755 F.3d 13, 20 (1st

Cir. 2014)).  On its own, contrary evidence in the record will

not "render an administrator's decision arbitrary."  *Al-Abbas* v.

*Metro. Life Ins. Co.*, 52 F. Supp. 3d 288, 295 (D. Mass. 2014).

However, the plan administrator "may not . . .cherry-pick the

evidence it prefers while ignoring significant evidence to the

contrary."  *Winkler* v. *Metro. Life Ins. Co.*, 170 F. App'x 167,

168 (2d Cir. 2006); *see also Black & Decker Disability Plan* v.

---

[11] The November 1 and November 6, 2018 denials and underlying reviews were based on a truncated record.  [AR4313; 3831]  In contrast, the September 16, 2019 denial reflects response to K.D.'s medical records, as submitted by her counsel.  [AR81]

*Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."). I address each of the reports, and K.D.'s arguments with respect to each reviewer, in turn.

### 1.   Dr. Allchin's Report

Dr. Allchin's report supported HPHC's November 1, 2018 denial of K.D.'s benefits.  [AR4313]  His report acknowledges that Ms. Mayerson stated the "key issue" is that Sierra Tucson "would be best able to treat all of [K.D.'s] mental health issues."  Yet Dr. Allchin decides, without referring to any in-network facility that would properly treat K.D. or explaining why Sierra Tucson was not the right facility, that a "[p]reference" for an out-of-network provider "does not over-ride the benefits provided by [the member's] plan."  [AR221] The denial letter itself simply refers to Walden as an in-network option.  [AR4313-4314]

### 2.   Dr. Liegmann's Report

Dr. Liegmann's report provides no analysis, but merely restates his conversation with Ms. Mayerson and summarily states "[K.D.] can be equally and efficaciously treated through an in-network facility."  [AR2]  Despite noting that Ms. Mayerson believed "[Sierra Tucson] was the only facility which could manage all diagnosis," Dr. Liegmann did not engage in an

23

analysis regarding her assertions.  [*Id.*]  The denial letter
again simply refers to Walden as an in-network option.  [AR4076]

### 3.  Dr. Sharma's Reports

Dr. Sharma's various reports, which HPHC credited in its
September 16, 2019 final denial letter [AR81], were based on a
significantly broader record than Dr. Allchin and Dr. Liegmann's
reports.  Dr. Sharma indicated that he spoke with Dr. Laurie
Gray, and reviewed K.D.'s medical records along with other
materials submitted, including letters from K.D.'s doctors.
[AR4216-4217]

Dr. Sharma's July 24, 2019 report summarizes his call with
Dr. Gray, wherein she states that K.D. "was primar[ily] sent to
Sierra Tucson for mood disorder treatment," and that "she knows
Walden and has sent some patients there" and thought "they do a
fine job but [K.D.] needed more of pain management."  [AR4216]
Dr. Sharma also indicates that he reviewed Ms. Mayerson's letter
[AR4217; AR555].  Ms. Mayerson's letter explains that based on
her three years of experience *working at Walden*, she did *not*
find it to be appropriate for K.D. because its "focus is
primarily on identifying and treating eating disorder symptoms,
which was not the urgent reason for [K.D.] seeking treatment at
that time."  [AR555]

Despite crediting these sources as references, Dr. Sharma
determined that Walden *was* the appropriate provider for K.D. as
it "focuses primarily on identifying and treating eating

disorder symptoms" — using nearly identical language as Ms. Mayerson, albeit to support the opposite conclusion.  [AR4217]

During the December 7, 2022 hearing on the cross-motions for summary judgment before me, Defendants contended that Dr. Sharma's July 24, 2019 report is the strongest example of HPHC's engagement with K.D.'s materials.  Defendants highlighted that Dr. Sharma had a peer-to-peer call with Dr. Gray and that although the entirety of each peer-to-peer call is not in the record, he considered her position.

Yet Dr. Sharma's report, which is the record evidence before me, does not address meaningfully why he comes to a conclusion opposite to that of K.D.'s treating doctor who has direct experience with Walden.  Moreover, although Dr. Sharma's July report gives passing mention to K.D.'s medical history and doctor reports, it does not meaningfully address how Walden would treat the depression, mood disorders, and pain management, the mental health treatment her doctors identified as urgent and a former Walden employee opined could not be treated properly in residential treatment at Walden.  [AR4217; AR555-556]  It appears that Dr. Sharma cherry-picked K.D.'s eating disorder symptoms, in an effort to pigeon-hole her treatment into Walden's specialization.  *See Santana-Díaz*, 919 F.3d at 695 ("The Supreme Court has recognized such cherry-picking as a factor to support setting aside a plan administrator's discretionary decision.").

The best that can be said for Dr. Sharma's opinion is that he went through the motions of consultation but there is no indication he made any intellectual movement to engage with the particularized contentions of K.D.'s treatment providers regarding Walden's inadequacy to treat her distinctively non-eating disorder mental health needs.

> a.   *Whether Dr. Sharma's Multiple Reports Violated ERISA and the Plan*

K.D. raises a second argument regarding Defendants' reliance on Dr. Sharma.  She asserts that HPHC's reliance on his three[12] separate reports violated ERISA and the Plan's terms. *See* 29 C.F.R. § 2560.503-1(h)(3)(v) (stating that a plan must use health care professionals who are "neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual" during reviews of a claim appeal)[AR4953].

Although Dr. Sharma authored three separate reports, two were related to the same appeal, and the third was for Voluntary Member Reconsideration, which K.D. ultimately withdrew. [AR5065]  The reports for K.D.'s second appeal do not violate ERISA or the Plan because they supported the same level of

---

[12] As a formal matter, it appears Dr. Sharma authored four reports.  However, his second report, dated July 2, 2019, merely corrected errors identified by Optum in the original June 21, 2019 report.  Accordingly, I refer to three reports, as K.D. does in her briefings.  [*See* Dkt. No. 38 at 19]

appeal, and K.D. does not contend that her correspondence
between the two reports constituted a formal appeal.  *Cf.*
*Nicholson* v. *Standard Ins. Co.*, 780 F. App'x 381, 384 (8th Cir.
2019) (per curiam) (suggesting that new doctor opinions are
required solely for formal appeals under ERISA).  With respect
to Dr. Sharma's Voluntary Member Reconsideration review, K.D.
withdrew her appeal.[13]  Accordingly, she has not been prejudiced
based on Dr. Sharma's multiple reports.

   4.   Conclusion

   Each of the doctors assigned to review K.D.'s case on
behalf of the Plan disregarded the opinion of K.D.'s treating
physicians without any meaningful explanation.  Although K.D.'s
doctors repeatedly emphasized the need for mental health
treatment, Drs. Allchin, Liegmann, and Sharma did not actually
engage in a discussion regarding her multifaceted diagnoses.  It
was their reports that provided the foundation for denial of

---

[13] Had K.D. pressed her Voluntary Member Reconsideration, she may
have been able to show that she was denied a full and fair
review due to Dr. Sharma's participation in multiple levels of
appeal.  Even in a voluntary appeal, ERISA's regulations likely
apply.  *See Spears* v. *Liberty Life Assurance Co. of Bos.*, NO.
3:11-cv-1807 (VLB), 2019 WL 4766253, at *49 (D. Conn. Sept. 30,
2019) (collecting cases for proposition that ERISA procedural
requirements apply to "voluntary" benefits appeals).
Accordingly, Dr. Sharma's review and recommendation to deny
benefits during two separate appeals, including one voluntary
appeal, could offend ERISA.  However, K.D. withdrew her request
prior to a final decision in Voluntary Member Reconsideration
and as a result, cannot claim she was prejudiced on this ground.

benefits.[14]  [*See* Nov. 1, 2018 Denial Letter AR4313; Nov. 6, 2018
Denial Letter AR3831; Sept. 16, 2019 Denial Letter AR81]

A plan "administrator's decision must be reasoned to
survive arbitrary and capricious review."  *Buffonge* v.
*Prudential Ins. Co. of Am.*, 426 F.3d 20, 30 (1st Cir. 2005)
(internal quotations and citation omitted).  Although K.D.'s
treating physician is not entitled to special weight or
deference under ERISA,  *Medina* v. *Metro. Life Ins. Co.*, 588 F.3d
41, 46 (1st Cir. 2009) (citing *Nord*, 538 U.S. at 834), the "plan
administrator cannot simply disregard the conclusions" of a
plaintiff's long-time provider,  *Al-Abbas*, 52 F. Supp. 3d at
296.  Moreover, "in the context of assessing psychiatric
disabilities," "[f]irst-hand observation is especially
important."  *Winkler*, 170 F. App'x at 168.

In this case, where a treating physician had direct
experience with the Plan administrator's preferred treatment
center and recommended against it, a reasoned decision should
explain why the treatment center was clearly the appropriate
fit.  *See Love* v. *Nat'l City Corp. Welfare Benefits Plan*, 574
F.3d 392, 397 (7th Cir. 2009) ("The Plan must provide a

---

[14] HPHC's September 16, 2019 denial letter also indicates review
of the September 9, 2019 review submitted by Dr. Lowenthal
(K.D.'s independent reviewer).  The extent of that review is not
entirely clear.  [AR81]  Dr. Lowenthal determined that at the
time of K.D.'s admission to Sierra Tucson, she "did not meet the
criteria for residential eating disorder treatment."  [AR4583]

reasonable explanation for its determination and must address any reliable, contrary evidence presented by the claimant."). Here, the independent reviewers did not provide that analysis, nor did HPHC's denial letters.[15]

The failure fairly to consider K.D.'s providers' opinions was a procedural violation that "had a connection to the substantive decision reached, and call[ed] into question the integrity of the benefits-denial decision itself." *Bard*, 471 F.3d at 244. Under these circumstances, K.D. was prejudiced.[16] K.D. was entitled to a review that "address[ed] substantial

---

[15] The September 16, 2019 denial letter provides some discussion of Walden's capabilities for treatment of co-occurring disorders, though it is not clear where the source of this underlying information is to be found. [AR82] The letter summarily states that "Walden's integrated treatment approach includes a multidisciplinary team of physicians, therapists, counselors, social workers, and dieticians who develop a treatment plan that helps address all symptoms co-occurring with an individual's eating disorder." [AR82-83] Even this description, however, appears to center on disordered eating, which was the secondary concern of K.D.'s providers. The letter also explains that "Walden's treatment services for co-occurring disorders includes residential care for all ages," [AR83] perhaps in response to K.D.'s providers expressed concern regarding Walden's residential facilities for the treatment of psychiatric symptoms [*see* AR555, Ms. Mayerson's letter suggesting that Walden cannot treat K.D.'s "complex symptom presentation" in a residential setting]. In the face of Ms. Mayerson's Walden expertise, the denial letters' summary statement is insufficient.

[16] That a doctor at Optum subsequently reviewed Dr. Sharma's report and found it "credible" does not cure the deficiencies in the initial review. [*See* Defs.' Mem. in Opp. to Summ. J., Dkt. No. 42 at 9 (arguing that Optum's review of Dr. Sharma's report demonstrates its credibility)]. Optum did not provide any additional reasoning to demonstrate why K.D.'s doctors' opinions should be rejected.

contrary evidence in a meaningful way." *Al-Abbas*, 52 F. Supp. 3d at 296; *see also Love*, 574 F.3d at 397 ("The Plan did not explain why it chose to discount the near-unanimous opinions of [K.D.]'s treating physicians.").  The cursory statements of explanation that HPHC and the reviewers provided were "insufficient to meet ERISA's requirement that specific and understandable reasons for a denial be communicated to the claimant." *Love*, 574 F.3d at 397.

C.    *Whether Substantial Evidence Supported HPHC's Denials*

As explained *supra*, the Plan administrator failed to consider K.D.'s providers' opinions fairly.  As to substantial evidence considered apart from fair process, K.D. acknowledges that the September 16, 2019 denial letter states that "Walden's program can treat individuals with co-occurring disorders, such as depression, anxiety, and eating disorders," but contends that HPHC failed to demonstrate that Walden was an appropriate in-network option to treat her co-occurring disorders, as required by the Plan.[17]  [*See* Plf.'s Mem. in Supp. of Summ. J., Dkt. No. 38 at 15-16; AR4912-4913 (describing the Plan's requirements for out-of-network coverage)]  In response, Defendants argue that because "Walden has a network agreement with HPHC to provide specific types of care to members in the Plan," "[i]t can be

---

[17] Specifically, K.D. argues that HPHC did not sufficiently explain how Walden was suitable for her primary "mental health diagnoses."  [Dkt. No. 38 at 16]

*safely assumed* that HPHC is aware of the type of services its contracted Plan Providers offer and that its client plans pay for." [Dkt. No. 42 at 9 (emphasis supplied)]  In their own memoranda regarding summary judgment and at the December 7, 2022 hearing on the cross-motions for summary judgment now before me, Defendants relied heavily on the independent reviewers as providing substantial evidence through such a "safe[] assum[ption]." [Dkt. Nos. 35 & 42 at 9]

Ms. Mayerson, Dr. Gray and Dr. Lowenthal, each of whom was familiar with Walden and its offerings, advocated against Walden because they had a demonstrated foundation — as opposed to resort to the talisman of "safe[] assum[ption]" — to believe that Walden's psychiatric treatment facilities were inappropriate for the level of care that K.D. needed. [AR731-732; AR555; AR4583-4584] Substantial evidence is "evidence reasonably sufficient to support a conclusion," and it "does not disappear merely by reason of contradictory evidence." *Doyle* v. *Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998). In the face of K.D.'s submitted evidence from her treatment providers, Defendants' "safe[] assum[ptions]" were insufficient to show that Walden was capable of treating K.D.'s mental health diagnoses.  Although K.D.'s providers are not entitled to special treatment, Defendants must provide an explanation for denial that complies with ERISA.  They have not done so and thus

have failed to establish that substantial evidence supports
their denial.

## D.   *Additional Alleged Procedural Violations*

K.D. acknowledges that she was provided with the appeals
process required under ERISA.  [Dkt. No. 38 at 17]  However, she
asserts that misarticulations of the Plan's standard for out-of-
network benefits in the November 1 and November 6, 2018 denial
letters, and in the reviews conducted on behalf of the
Defendants, rendered the review unfair.  [*Id.* at 18, 19]

K.D. is correct that there are some misstatements of the
Plan's out-of-network requirements in the November 1 and
November 6, 2018 denial letters.  *See* AR133 (stating that K.D.
did "not have an out-of-network option" in the Plan); AR3831
(stating that K.D. may only receive treatment from out-of-
network providers "in the case of an emergency").  She also
identified similar statements in reports by Drs. Allchin,
Liegmann, and Sharma.  *See* AR160 (requiring an "emergency" for
out-of-network benefits in Dr. Allchin's report); AR2 (referring
to an "exceptional need" in Dr. Liegmann's report); AR40
(demanding "extenuating circumstances" for out-of-network
treatment in Dr. Sharma's February 17, 2020 report).

K.D.'s argument asks me to look at these statements in
isolation.  However, reading each of these documents in their
entirety reveals that K.D.'s claim was assessed consistently
with reference to the appropriate standard and the reasoning

supporting denial aligned with the Plan requirements.   In the
November 1, 2018 denial, just under the language K.D. points to,
Optum explains that the reviewing doctor found that there were
"services available in network" that other members have used for
"similar issues," and accordingly denied K.D.'s claim.   [AR133]
Similarly, in the November 6, 2018 denial, the letter explains
that the reviewer determined K.D. "[could] be effectively
treated through an available in-network facility."   [AR3832]
Likewise, the statements of the doctors that K.D. identifies are
similarly isolated; when read in context, the denial of benefits
is facially within the Plan requirements.   *See, e.g.,* AR160
("Taking into consideration all the above information . . . and
also the locally available clinical services, it is my opinion
that the requested service does not meet the health plan
requirements regarding [out-of-network] accommodations.").
Accordingly, K.D. was not denied "full and fair review" on these
grounds, nor was she prejudiced by this language. *See DiGregorio*
v. *Hartford Comprehensive Emp. Benefit Serv. Co.*, 423 F.3d 6, 17
(1st Cir. 2005) ("In short, [plaintiff] has not shown prejudice
in a relevant sense." (internal quotations and citation
omitted)).

### E.   *K.D.'s Remedy*

Having determined that the Plan administrator acted
arbitrarily and capriciously by failing to (1) properly consider
and weigh K.D.'s providers' opinions, and (2) substantiate its

claim that Walden could properly treat K.D.'s diagnoses, I now
turn to K.D.'s remedy.  Though ERISA imposes a deferential
standard of review, it "does not deprive a court of its
discretion to formulate a necessary remedy when it determines
that the plan has acted inappropriately." *Cook* v. *Liberty Life
Assurance Co. of Bos.*, 320 F.3d 11, 24 (1st Cir. 2003).  I "can
either remand the case to the administrator for a renewed
evaluation of the claimant's case, or . . . award a retroactive
reinstatement of benefits."  *Id.*

Here, the record does not compel the finding that K.D. is
entitled to benefits.  Primarily, "[t]he problem is with the
integrity of [HPHC's] decision-making process." *Buffonge*, 426
F.3d at 31.  With respect to K.D.'s doctors, the independent
reviewers failed to weigh their opinions fairly.  As to the
assertion that Walden was the appropriate venue for K.D.'s
treatment, the denial letters failed to explain why Walden would
suffice for K.D.  On the record before me, I cannot say that
K.D. is clearly entitled to the denied benefits, but she is
clearly entitled to a fair process.  *See id.*  Accordingly, I
will remand K.D.'s claim to the Plan administrator for further
proceedings that are consistent with this memorandum.  *Id.* at
32.

### III. COUNT III — VIOLATION OF THE MENTAL HEALTH PARITY AND ADDICTION EQUITY ACT

In Count III, K.D. brings a claim under the Mental Health

Parity and Addiction Equity Act (the "Parity Act"). [Dkt. No. 1 at ¶¶ 68-73]  Defendants move for summary judgment on Count III [Dkt. No. 34 at 2], arguing that K.D. failed to identify a disparity between the Plan's mental health benefits and medical or surgical benefits as required by the Parity Act.  [Dkt. No. 35 at 19-21]  K.D.'s cross-motion for summary judgment on Count III [Dkt. No. 37] is based on the contention that although the Plan appears to offer mental health benefits, the network was inadequate.  [Dkt. No. 38 at 12-14]

**A.   *Standard of Review***

Generally, the Parity Act requires that "ERISA plans provide no less generous coverage for the treatment of mental health and substance use disorders as they provide for medical or surgical disorders." *Steve C.* v. *Blue Cross & Blue Shield of Mass., Inc.*, 450 F. Supp. 3d 48, 54-55 (D. Mass. 2020).

Parity Act violations typically occur when "a health insurance plan (1) appl[ies] treatment limits that are more restrictive than 'the predominant treatment limitations applied to substantially all medical and surgical benefits' or (2) appl[ies] 'separate treatment limitations' only to mental health or substance use disorder benefits." *N.R. by and through S.R.* v. *Raytheon Co.*, 24 F.4th 740, 747 (1st Cir. 2022) (quoting 29 U.S.C. § 1185a(a)(3)(A)(ii)).  Under the law, there must be parity between mental health and medical benefits in the same classification, which includes "(1) inpatient, in network

services; (2) inpatient, out of network services; (3)
outpatient, in network services; (4) outpatient, out of network
services; (5) emergency care; and (6) prescription drugs." *Id.*
(quoting 29 C.F.R. §§ 2590.712(c)(1)(i), (c)(2)(ii)).

Here, K.D. argues that Defendants violated the Parity Act
by failing to provide parity with respect to nonquantitative
measures[18], in this case, the network available for residential
mental health and eating disorder treatment.  A fair reading of
the Parity Act indicates that K.D. must show[19]

> (1) the insurance plan is of the type covered by the
> Parity Act; (2) the insurance plan provides both
> medical benefits and mental-health benefits; (3) the
> plan has a treatment limitation – either quantitative
> or nonquantitative – for one of those benefits that is
> more restrictive for mental-health treatment than it
> is for medical treatment; and (4) the mental-health
> treatment is in the same classification as the medical
> treatment to *which it is being compared*.

*Bushell* v. *UnitedHealth Grp. Inc.*, No. 17-CV-2021 (JPO), 2018 WL
1578167, at *5 (S.D.N.Y. Mar. 27, 2018) (emphasis added) (citing
29 C.F.R. § 2590.712(c)(2)(i)) (describing elements of Parity

---

[18] Under the Parity Act, "quantitative treatment limitations . .
. are expressed numerically (such as 50 outpatient visits per
year)."  29 C.F.R. § 2590.712(a).  In contrast, "nonquantitative
treatment limitations . . . otherwise limit the scope or
duration of benefits for treatment."  *Id.*;  *see also Bushell* v.
*UnitedHealth Grp. Inc.*, No. 17-CV-2021 (JPO), 2018 WL 1578167,
at *4 (S.D.N.Y. Mar. 27, 2018).
[19] Defendants note that there is "no universal pleading standard"
for Parity Act claims.  [Dkt. No. 35 at 20]  However, I find
"parity" to be "[t]he quality, state, or condition of being
***equal***" and accordingly denotes some kind of comparison in this
context.  *Parity*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis
added).

Act violation in motion to dismiss posture).  K.D. fails to provide any facts for comparison.  In other words, she does not show that there is a difference between the Plan's treatment of residential mental health treatment and physical or medical treatment, beyond tallying the number of mental health providers.  Accordingly, I will grant Defendants' motion for summary judgment on Count III.  [*See* Dkt. No. 34]

### IV. COUNT II – ATTORNEYS' FEES AND COSTS

Defendants move for summary judgment on Count II, which requests "reasonable attorney's fee[s] and costs of [the] action" under 29 U.S.C. 1132(g)(1).  [Dkt. Nos. 1 at ¶¶ 62-67; 35 at 21-22]  K.D. seemingly also moves for summary judgment on Count II but offers no sustained affirmative argument in her summary judgment submission.  [Dkt. Nos. 37; 38 at 20]

As a threshold matter, in an ERISA case, I "may award fees whenever a party has showed '*some degree of success on the merits*.'"  *Doe* v. *Harvard Pilgrim Health Care, Inc.*, 974 F.3d 69, 75 (1st Cir. 2020) (emphasis added) (quoting *Hardt* v. *Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245 (2010)).  In *Hardt*, the Supreme Court left open the question of whether remand alone is sufficient to show some success as required for ERISA attorneys' fees eligibility.  560 U.S. at 256.

In the wake of *Hardt* the First Circuit has indicated that remand is likely sufficient to meet the requirement of at least some success on the merits.  *See Gross* v. *Sun Life Assurance Co.*

37

*of Canada*, 763 F.3d 73, 78 (1st Cir. 2014) (finding the "majority position" that remand is sufficient for the possibility of attorneys' fees "persuasive"). A remand typically represents "two positive outcomes": "(1) a finding that the administrative assessment of the claim was in some way deficient, and (2) the plaintiff's renewed opportunity to obtain benefits or compensation." *Id.* Accordingly, I find that because I am remanding this case to the claims administrator, K.D. is eligible for attorneys' fees.[20]

Eligibility alone is insufficient to demonstrate entitlement to attorneys' fees. *Hatfield*, 162 F. Supp. 3d at 44. Rather, I must weigh the following five factors to determine whether fees are warranted:

> (1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter

---

[20] I have found remand sufficient for fees eligibility in an ERISA case previously. *See Hatfield* v. *Blue Cross & Blue Shield of Mass., Inc.*, 162 F.Supp.3d 24, 44 (D. Mass. 2016) ("Returning a claim to the entity primarily tasked with determining benefit eligibility, along with an order to provide beneficiaries with all the procedural protections to which they are entitled, is an important measure of success in a scheme in which the federal courts sit in a quasi-appellate role."). Certain of my colleagues in this district have taken the same approach. *See, e.g., Cannon* v. *Aetna Life Ins. Co.*, No. 12-10512-DJC, 2014 WL 5487703, at *3 (D. Mass. May 28, 2014) ("remand provided a meaningful benefit"); *McCarthy* v. *Com. Grp., Inc.*, 831 F. Supp. 2d 459, 493 (D. Mass. 2011) (Saris, J.), *judgment vacated on other grounds by* No. 09-CV-10161-PBS, 2012 WL 13050457, at *1 (D. Mass. Feb. 3, 2012) (pre-*Hatfield* case in which attorneys' fees were necessarily non-final determination resulting in a reconsidered decision to stay briefing on attorneys' fees until conclusion of case).

other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions.

*Cottrill* v. *Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d 220, 225 (1st Cir. 1996),*abrogated on other grounds by Hardt*, 560 U.S. at 250, 253 (plaintiff need not be "prevailing party" for award of attorneys' fees in ERISA case).  Each case is different; no one factor will determine eligibility, and I may consider other factors as relevant to the matter at hand.  *Hatfield*¸ 162 F. Supp. 3d at 44.

The first factor weighs somewhat in favor of fees; "[HPHC] was culpable at least as to the bases for remand."  *Cannon* v. *Aetna Life Ins. Co.*, No. 12-10512-DJC, 2014 WL 5487703, at *4 (D. Mass. May 28, 2014).  As to the second factor, HPHC argues that "[K.D.] has not provided any evidence . . . regarding the Defendants' ability to pay" [Dkt. No. 35 at 22] but does not explicitly contest that it could pay a reasonable fee award. This factor "weighs in [K.D.'s] favor to the extent HPHC does not contest its ability to pay," though ability to pay alone will not warrant an award of fees.  *Doe* v. *Harvard Pilgrim Health Care, Inc.*, No. 15-10672, 2019 WL 3573523, at *15 (D. Mass. Aug. 6, 2019); *see also Gross*, 763 F.3d at 84.

The third factor weighs strongly in K.D.'s favor. Deterrence serves to "motivate[e] fiduciaries to comply more attentively with the procedural obligations imposed by ERISA."

*Hatfield*, 162 F. Supp. 3d at 45.   Here, HPHC largely ignored or sidestepped the evidence that K.D. submitted.   Deterring plan administrators from unfairly ignoring duly submitted records and opinions is an important policy.   In this case, "evenhanded treatment of [K.D.'s] substantial medical evidence . . . might have led to a quicker resolution of [K.D.'s] claim — one way or the other."   *Gross*, 763 F.3d at 84.   At bare minimum, deterring this behavior will ensure that claims are adjudicated promptly and fairly.[21]   Because "deterrence can serve as a benefit to plan participants generally," the fourth factor also weighs in favor of an award to K.D.   *Hatfield*, 162 F. Supp. 3d at 45.

As to the final factor, the relative merits of the parties' positions "are not one-sided" in this case.   *Gross*, 763 F.3d at 85.   Although K.D. has demonstrated that she is entitled to remand, she has not yet shown an entitlement to benefits under the Plan.   Moreover, I have granted Defendants' motion for summary judgment as to the Parity Act.   [*See* Dkt. Nos. 34 at 2;

---

[21] During the December 7, 2022 hearing on the motions for summary judgment before me, K.D.'s counsel urged me to award benefits, rather than remand, to deter Defendants' behavior.   As K.D.'s counsel noted during oral argument, my colleague, Judge Hillman, awarded benefits in *Young* v. *Aetna Life Insurance Company*, 146 F. Supp. 3d 313, 336-337 (D. Mass. 2015), though in a matter where he "[was] convinced that Plaintiff was denied benefits to which she was clearly entitled."   That is not the state of the record before me.   Only after a fair process will it be possible to assess whether K.D. is entitled to benefits.   At this juncture, the deterrence provided by an attorneys' fees award would appear sufficient to secure such a fair process.

35 at 19-21]  Accordingly, this factor does not favor K.D.'s
motion for fees.

On balance ultimately, the *Cottrill* factors weigh in favor
of K.D.'s request for fees.  Neither party has argued that I
should consider additional factors, and I see no need to do so
here.  Based upon my review of these factors, I find that K.D.
is entitled to fees pursuant to Section 1132(g)(1), and grant
K.D.'s motion for summary judgment on Count II.

### V. CONCLUSION

Although K.D. may not be entitled to coverage for her out-
of-network treatment at Sierra Tucson, she is entitled to a fair
process under ERISA.  I will remand K.D.'s claim to HPHC so that
all relevant issues and provider opinions can be considered
properly.  I do not in this Memorandum, however, make a
substantive determination regarding K.D.'s coverage.
Accordingly, for the reasons set forth above, it is ORDERED that
K.D.'s benefits claim under Count I is GRANTED to the extent
that the claim be REMANDED for further proceedings not
inconsistent with this Memorandum.

Further, having determined that K.D. is entitled to an
award of attorneys' fees, it is ORDERED that K.D.'s claim under
Count II as it exists at this point is GRANTED and that the
amount of such fees shall be further developed on the agreed
upon schedule developed at the December 7, 2022 motion hearing,
*see* Dkt. No. 60, that on or before January 11, 2023, K.D. shall

submit a fully supported submission for the award of fees she seeks; Defendants may file any response on or before February 1, 2023.

As to Count III, I GRANT Defendants' motion [Dkt. No. 34] for summary judgment.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

**APPENDIX**

In the Memorandum and Order to which this Appendix is attached, I have disposed of the parties' initial cross-motions for summary judgment.  I remanded the benefits claim and determined that K.D. is entitled to reasonable attorneys' fees. I granted Defendants' motion for summary judgment [Dkt. No. 34] on Count III.  In connection with the cross-motions for summary judgment, Defendants also filed three motions to strike [Dkt. Nos. 40, 48, 51], which I address now and deny.

*A.   Defendants' Motion to Strike Exhibit A [Dkt. No. 40]*

Defendants moved to strike [Dkt. No. 40] K.D.'s Exhibit A [Dkt. No. 38-1], a settlement document involving unrelated litigation in which certain of the Defendants in this case were parties, filed with K.D.'s memorandum in support of her motion for judgment on the record.  K.D. did not oppose Defendants' motion to strike Exhibit A and has withdrawn it.  [Dkt. No. 46] Accordingly, I did not consider K.D.'s Exhibit A in resolving the cross-motions for summary judgment, and GRANT Defendants' motion to strike [Dkt. No. 40] as unopposed by Plaintiff.

*B.   Defendants' Motion to Strike K.D.'s References to Walden's Website [Dkt. No. 48]*

Defendants moved to strike [Dkt. No. 48] citations to Walden's website, which K.D. included in her opposition to Defendants' motion for summary judgment [Dkt. No. 44] to substantiate further her argument that Walden was unsuitable for

her treatment.  As I explained in the Memorandum and Order,
*supra* at 30-32, without reference to K.D.'s website citations,
Defendants have failed to demonstrate that substantial evidence
supported its decision that Walden was appropriate for K.D.  I
observe, however, the irony that Defendants for their part also
sought to rely upon the Walden website in support of their
contentions during oral arguments.  In any event, I did not
consider the citations to Walden's website to resolve the cross-
motions for summary judgment.  This evidence needs to be
developed as necessary in some admissible form fleshing out the
website's marketing puffery.  For now, I GRANT the motion [Dkt.
No. 48] to strike citations to the Walden website.

**C.   *Defendants' Motion to Strike K.D.'s References to Provider
       Websites [Dkt. No. 51]***

Finally, Defendants moved to strike [Dkt. No. 51] K.D.'s
references to the websites of other in-network providers in her
reply in support of summary judgment [Dkt. No. 47].  As I
explained in the Memorandum and Order accompanying this
Appendix, *supra* at 20-22, the question presented to me is
whether *Walden*, as opposed to all available in-network
providers, was an appropriate in-network option for K.D.'s
treatment.  As a result, I did not consider K.D.'s other in-
network website provider citations in resolving the cross-
motions for summary judgment, although I did observe that the
Cambridge Eating Disorder Center is in the Plan's network as

explained *supra* Part I.B. at 6 & n.3.  This motion to strike [Dkt. No. 51] is consequently also GRANTED, in light of Defendants' abandonment of the contention that any in-network provider other than Walden is relevant to resolution of K.D.'s claim for benefits.  Nevertheless, the need for K.D. to address this ultimately abandoned contention in connection with the cross-motions for summary judgment may support an appropriately enhanced, but carefully measured and tailored award of reasonable attorneys' fees under Count II in this regard.